**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| NICHELLE C. SCOTT | ) | CASE NO. |
| 3281 Washington Boulevard | ) | |
| Cleveland Heights, OH 44118 | ) | |
| | ) | |
| Plaintiff | ) | JUDGE |
| | ) | |
| -vs- | ) | |
| | ) | |
| POWERLINE ASSESSORS, LLC | ) | C O M P L A I N T |
| 16112 West Park | ) | |
| Cleveland, OH 441112 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| POWERLINE ASSESSORS PR, LLC | ) | |
| 16112 West Park | ) | |
| Cleveland, OH 441112 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GREG SOMERVILLE | ) | |
| In his individual capacity and in his | ) | |
| capacity as CO-OWNER | ) | |
| 16112 West Park | ) | |
| Cleveland, OH 441112 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MARY DEVRING | ) | |
| In her individual capacity and in her | ) | |
| capacity as CO-OWNER | ) | |
| 16112 West Park | ) | |
| Cleveland, OH 441112 | ) | |
| | ) | **JURY TRIAL REQUESTED** |
| Defendants. | ) | |

1

## NATURE OF THE ACTION

1.      This is a civil rights action brought under 42 U.S.C. §§ 1983, 1985(3) and 1986. This action is also brought under 29 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) and O.R.C. § 4112.   Plaintiff further asserts state law breach of contract, promissory estoppel, defamation and intentional infliction of emotional distress claims.

2.      While the individual Defendants were acting within the scope of their employment and under the color of state law, they unlawfully discriminated against Plaintiff resulting in the denial of their rights and benefits of their employment based upon their medical handicap or condition, gender and the creation of a hostile work place.

## JURISDICTION AND VENUE

3.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1343 and 1367.

4.      This Court has personal jurisdiction over Defendants and venue is conferred on this Court in the Southern District of Ohio by 28 U.S.C. § 1391 because the facts giving rise to Plaintiff's claims took place within the jurisdiction of the US District Court for the Northern District of Ohio.

## PARTIES

5.      Plaintiff is Nichelle C. Scott (aka Nichelle C. Badgette) and she is a survivor of racial and sexual discrimination and sexual harassment while in the employ of Powerline Assessors, LLC ("PLA") and PLA, PR LLC ("PLA, PR").

6.      I was employed by the Defendants employed her for the three weeks of employment with either PLA or PLA PR. Both of the companies employed in excess of twenty (20) employees.

7.      PLA, PR is a Puerto Rican limited liability company with owners Greg

2

Somerville and Mary Devring that is a successor entity to PLA.

8.      PLA is owned by the same owners as PLA, PR.

9.      PLA is an independent Limited Liability Corporation organized in the State of Ohio. Company ownership and daily operations are 51% female and 100% Senior.

10.     PLA consists of teams of power line assessors and drivers who are ready at a moment's notice to tackle the most challenging power line and electrical crises. PLA's contractors are retired linemen who have over 4,000 years of experience with major utility companies. The majority of PLA's drivers are retired law enforcement officers and firefighters; all who are trained as first responders in emergency situations. The PLA management and administrative team of nine have over 300 years of office and IT experience.

11.     Power Line Assessors, LLC is headquartered at 16112 West Park Cleveland, OH 44111 with a mailing address of PO Box 110671, Cleveland, Ohio 44111.

12.     PLA and or PLA, PR are subcontractors working under the general contractor, Power Secure 1609 Heritage Commerce Court, Wake Forest, North Carolina 27587 Ph: 919-556-3056, for a contract with the US Army Corps of Engineers 441 G Street Washington, D.C. 2034-1000 Human Resources 202-761-0559. The subject of the contract is the restoration of the power grid in Puerto Rico that was damaged by the hurricanes that hit the islands this fall.

13.     The employees worked out of a base camp located on West Parade/ Ramey Base Belt Road, Aguadilla, Puerto Rico 00603. Initially, the men stayed on the base in trailers and the women stayed at Courtyard at Marriot Hotel located at 200 West Parade Road, Aguadilla Puerto Rico 00603 1-787- 658- 8000 Eric Ruiz Colon Director Of Operations.

14.     All of the required daily meetings and meals were at the base camp.

15.     Plaintiff first became aware of PLA through a good friend Gregory D. Smith Sr.

who bragged about how his friend, Greg Somerville, who he worked for at Cleveland Public Power for over 30 years had contacted him about helping with the electricity disaster in Puerto Rico.   Somerville wanted him to apply for a position and he was guaranteed a job because they worked side by side for so long. Thus, Mr. Smith applied along with his son and myself.

16.     Plaintiff filled out the application on October 11, 2017. Plaintiff received a confirmation email that her application was received and that someone would be in contact with further details.

17.     Days later I received a text message stating that her application was accepted and that she would be sent deployment instructions by October 17, 2017 to leave for San Juan, Puerto Rico. October 17, 2017 came and went. A few days following Plaintiff received another text instructing her to fill out W-9 IRS forms and deductions information and the contract.

18.     The contract was for a period of eighty (80) days at $23.00 per hour and employees worked seven days per week for 12 hours per day from approximately 5:30 A.M. until approximately 5:30 P.M. They did not have any days off and even worked holidays.

19.     Thereafter, Plaintiff received a text message that stated, "if we missed deployment we would be sued for the complete cost of our stay, flights, work hours, legal fees everything in our contract that we agreed to". Therefore, Plaintiff was unable to work anywhere else while on standby. Thus, her income was diminished.

20.     On December 10, 2017 Plaintiff received her deployment after being on standby for over two and a half months. She was deployed on December 18, 2017 and left Cleveland and arrived at San Juan, Puerto Rico that same day. Upon our arrival she had to wait from 1:00 pm until 11:00 p.m. that night until the drive of two hours to Aguadilla from San Juan in extreme darkness and very dangerous conditions.

21.     The first few days were rocky as they did not have instructions to do anything and had several meetings introducing all the new people to the camp. On the third day in the evening her supervisor Andy Jones seemed intoxicated and came up to her and put his arm around her and pulled her body into him and said, "I hear you're the most popular person on camp."

22.     Plaintiff did not know this man for him to even approach her that way or like that so she pulled away from him and didn't say anything and walked away to the camp mess hall to get something to eat. In no way, shape or form did she ever consent to any intimate personal contact with Andy Jones or any other male with whom she was working with or around in Puerto Rico.

23.     Mr. Jones' apparent condition of being intoxicated is in stark contrast of when they arrived and were told pursuant to Mr. Jones' strict instruction that no drinking was allowed on the base. Instead, here it is the third night and he is drunk and attempting to engage in an unwanted and non-consensual hug even before they really even start working.

24.     The next day the employees finally received their instructions and assignments and the foreman we were supposed to report and they went off to work.

25.     Plaintiff was assigned to be Mr. Smith's driver and his job as an assessor was to assess the condition of the electrical poles and lines upon our routes that were given to us each morning at the daily-required meetings.

26.     Each day thereafter while they were working there would be some type of complaint from Mr. Jones directed at them or he had them waiting on the side roads for hours without instruction. Mr. Jones complained that she was trying to tell the foreman where to fix the electrical lines at people's homes and that never happened. He complained about where Plaintiff parked. Plaintiff could not park certain places and every time she parked he said if she did it

again she would be fired.

27. The next situation with this man was when he made a remark about her shirt and said that if she dressed inappropriately she could be fired. He complimented the shirt that she was wearing and said he had no issue with it but she could be fired. It was a tank top that was very high and covered all cleavage. There were men and women who wore the same type of tank top all throughout the camp.

28. No one ever explained to Plaintiff that there was a dress code. There were other women around the camp wearing leggings revealing their underwear and very tight clothes but he told Plaintiff that her clothing was offensive. Plaintiff wore jeans, steel toe boots and on this day also wore a tank top. Therefore from that point on she did not wear the shirt at the camp.

29. Plaintiff had a pair of ripped jeans that showed her knee and was told by Mr. Jones that they were inappropriate as well so she did not wear them any longer either.

30. Plaintiff was told not to park in certain spots or she would be fired, if she missed mandatory meetings she would be fired, if she conducted myself inappropriately she would be fired, and that was just from Mr. Jones making reports toward her on a daily basis. She was constantly told that if she made mistakes she would be automatically fired with no repercussions upon him or the company. No warnings, no write up just automatically fired

31. Plaintiff told someone above Mr. Jones who worked for the general contractor, Power Secure that was over the PLA or PLA, PR.. The man was the boss over the camp at the time and his name was Randy (last name unknown). Randy said that he would get a handle on it and the next day the foreman and safety inspectors held a meeting about conduct towards the women.

32. Plaintiff also spoke to Randy's successor, Kenneth Means, and reported to him

the discrimination and harassment that she had been subjected. Mr. Jones saw her talking to him and he reported it to Mr. Somerville. Three days later I was released from my employment.

33.     Plaintiff never ate on campus or in the mess hall. Instead, in order to avoid being sexually harassed, she had to grab her food and went to the car. This was because she was approached so much by men at base camp. These men would make unwanted statements about her looks and body. They would constantly ask her about sex. And, they would make lewd and inappropriate comments. Overall, on an almost daily basis while at base camp she was subjected to sexual harassment and unwanted advances and sexual banter.

34.     But, instead of investigating and protecting Plaintiff she was told her conduct was going to get her fired although these men were accosting her. The final straw was when Greg Somerville called my assessor Greg Smith Sr. and told him on the phone " he has been getting negative reports about her and if she did not get myself under control, she would be fired and would have to pay to get home and for all expenses and losses in the contract." Mr. Somerville did not know that Mr. Smith had her on speakerphone.

35.     Plaintiff was outraged because there were no complaints about her work. And, it was the supervisor Mr. Jones who was making negative reports against her from the time he had touched her and she rejected his advances. Those negative reports were false, defaming and untrue and Plaintiff felt targeted and isolated.

36.     Later the PLA, PR administrator Ms. Deborah Hollan on base camp arranged a meeting to discuss sexual harassment with all of the women. At this bogus women's meeting Ms. Hollan revealed that Mr. Jones has it out for women because he was terminated because of a woman while employed by a different employer in the aftermath of hurricane Sandy. Mr. Jones also admitted this to Plaintiff later at a meeting with the president of PLA, PR  Greg Somerville,

Ms. Hollan, Mr. Jones, Mr. Smith, my assessor, and Plaintiff. The president said I had nothing to worry about and everything was handled and I would be ok. Only, three days later I was released from my contract and Mr. Smith was terminated.

37.    Defendants said they fired Plaintiff because her assessor, Mr. Smith, was incompetent after working for over three weeks. And, this was despite the fact that he was Greg Somerville's assistant for 30 years and trained or worked right next to him. And now, they are to believe that Mr. Smith was incompetent. They said that since Mr. Smith was fired that they did not have any work for Plaintiff so she was also released. However, if that was true then why is there another white female driver, JoLynn Hastings, that continued her employment still employed and she changed over 5 drivers and still kept her job.

38.    After Plaintiff spoke out about being sexually harassed at the meeting with Mr. Somerville there were four other teams that were following Plaintiff and her assessor around and checking their work. Other white employees have been reassigned again and again or were told to relax until they had more work.

39.    They destroyed all the work that Mr. Smith and Plaintiff submitted in order to terminate him for incompetence. The paperwork that Mr. Smith had turned in for the month that they worked disappeared from the office. They did well over 250 reports of damage for the two circuits they were assigned. And, previously they were told that they were moving too fast as compared to the other assessment teams and that they should slow down so that they do not the other teams look bad. It seemed like the company was intentionally moving slowly so that it would take longer to wire the island.

40.    Indeed, they got rid of him to get rid of Plaintiff; because of the sexual harassment she was experiencing on that site. It was not due to any work conduct or activity after hours. It

was racial and sexual discrimination and harassment. The employees were working 84 hours per week with no days off or holidays and did not get paid until nearly a month after they were there.

41.     They did not protect the women or have any evacuation procedures for the tsunami evacuation and if there had been a tsunami that hit the island all of the women at the hotel were left to die because they were never alerted regarding the tsunami warning nor evacuated. The men on the other hand were alerted and evacuated. The Pacific Tsunami Warning Center initially warned that tsunami waves up to 1 meter (3 feet) above tide level could hit parts of Honduras, Belize and Puerto Rico along with the U.S. and British Virgin Islands. The tsunami warning was issued for nearly all of the Caribbean Sea due to an earthquake off of the coast of Honduras on January 9, 2018.

42.     The only assistance that Plaintiff received after she made her complaints was that she was advised to stay clear of anyone who may have made her uncomfortable at the base camp. Additionally, Ms. Hollan, the PLA administrator on site at base camp during meals and meetings, offered to stay close to me to ensure that no one bothered me. And, Plaintiff was told that she could not be at base camp after 6:00 P.M. even though the mess hall was open until 9:00 P.M. Therefore, if they finished late she would have to spend my own money for dinner if it was after 6:00 P.M.

43.     Additionally, it makes no sense that Plaintiff was released from her employment on January 13, 2018 due to the dismissal of her assigned assessor, Mr. Smith. And, since her release from her employment the employer is saying that the facts uncovered as a result of Plaintiffs attorney due diligence letter would have required her immediate termination.

44.     The Defendants have accused Plaintiff of making material misrepresentations on her application with PLA by not admitting her felony record. However, Plaintiff did disclose that

she had been convicted of a felony on my application so this is untrue.

45.    Defendants were supposed to protect Plaintiff. Now she is being slandered and discredited and degraded by this company. Plaintiff reported the discrimination and harassment to them and then she was subjected to shame and guilt as if she the one to blame.

46.    In summary, a drunken Mr. Jones groped Plaintiff on the third night that she arrived at the base camp. After she rejected his advance he subjected her to constant and almost daily complaints, threats and criticisms. He made her feel that her clothing and dress were inappropriate even though she was dressed consistent with other employees both male and female. she was restricted from being at the base camp at certain times without an escort watching her every move. The president of the company called Mr. Smith, a co-employee, and spread gossip and innuendo regarding her character and sexual activity without her permission. She experienced almost daily sexual harassment in the form of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature from other employees of PLA, PLA, PR or other men at base camp.

47.    On the other hand, the employer never conducted a Human Resource investigation. The employer never took an official statement from Plaintiff or any of the people who witnessed the conduct or with whom she discussed the harassment except for Ms. Hollan. Neither Mr. Jones nor any other employee was counseled or written up for their conduct. No corrective action was taken to reeducate any of the employees or staff. Instead, Plaintiff was isolated, segregated and denied equal access to the benefits of her employment all in violation of her civil rights.

48.    Plaintiff and Mr. Smith were replaced even before they left the island. This was all a plot to remove the only two black people and the only black female working for PLA.

## COUNT ONE - DISCRIMINATION

49.     Plaintiff received her Dismissal and Notice of Rights on or about February 17, 2019 attached hereto as **EXHIBIT "A"**.

50.     Defendants unlawfully discriminated against Scott, an educated, skilled, and qualified employee, who was fully qualified for her position and employment, and who performed her assigned duties timely and fully, despite such disabilities and whereby said discriminatory acts and conduct by Defendants were in violation of the Act, all to the detriment, harm and loss of Scott, who demands compensatory damages and punitive damages against Defendants jointly and severally, with prejudice, in the amounts stated at the end of these Complaint.

## COUNT TWO - FLSA VIOLATIONS

51.     Scott was an hourly employee who was working under an employment contract.

52.     During said term of employment and until wrongful termination of her employment Scott was not written up or otherwise disciplined despite being threatened with same on numerous occasions.

53.     Scott worked more than 80 hours each week, as required by her assigned duties but was not fairly or properly compensated by the employer for her overtime work and services, as a "non-exempt" employee, as required under the provisions of the Fair Labor Standards Act, (FLSA), which were fully applicable to this employee.

54.     Scott demands compensatory and punitive damages against Defendants for all overtime hours worked during her employment at the full rate of 1-1/2 times her hourly wages, all as prescribed by the Act and for such other and further awards at law and equity

as this Honorable Court shall find, make and order.

## COUNT THREE - WRONGFUL TERMINATION OF EMPLOYMENT

55.     Throughout her entire employment with Scott was neither reprimanded nor suspended, in writing documented, for any cause.

56.     At all times during her employment Scott performed her assigned duties diligently, earnestly, honestly and intelligently, with complete dedication to her employer.

57.     Defendants have no probative, admissible evidence or testimony to support any of its claims against Scott.

58.     Only after Scott complained about her employer's failure and refusal to protect her from race and sexual harassment terminate her employment, wrongfully and in retaliation, for all of which Scott demands judgment against Defendants for compensatory and punitive damages, jointly and severally, with prejudice, and in the amounts set forth at the end of this Complaint.

## COUNT FOUR - BREACH OF CONTRACT OF EMPLOYMENT

59.     Defendants employed Scott on a contract basis at an hourly rate of $23.00 Dollars per hour.

60.     Defendant breached the contract of employment with Scott by early termination, without cause prematurely, for all of which Scott demands judgment against Defendants for compensatory and punitive damages, jointly and severally, with prejudice and in the amounts set forth at the end of this Complaint.

## COUNT FIVE - WRONGFUL RETALIATION

61.     Defendants termination of Scott's employment, in retaliation for Scott's having complained about her treatment are wholly unsupported with admissible, probative

12

evidence in this cause, and are each contrary to Ohio's public policy protections, warranting dismissal, for all of which damage, harm and loss Scott demands judgment against Defendants for compensatory and punitive damages, jointly and severally, with prejudice, against Defendants and in the amounts set forth at the end of this Complaint.

## COUNT SIX - DEFAMATION - LIBEL SLANDER

62.    Defendants have communicated with other people without Plaintiff's consent and have made negative and untrue statements against her without immunity to do so as mere allegations, published and spoken of Scott were and are, without supporting admissible, probative evidence,  and this conduct is libelous and slanderous, intended to damage and harm Scott's professional reputation and standing in the industry and community, for all of which damage, harm and loss Scott demands judgment against Defendants for compensatory and punitive damages, jointly and severally, with prejudice, and in the amounts set forth at the end of this Complaint.

## COUNT SEVEN – DURESS

63.    Defendants were, at all times pertinent herein, fully informed of Scott's stated emotional and physical difficulties caused by the harassment and did nothing to protect her.

64.    Defendants failed and refused to provide any reasonable accommodations for Scott's protection and instead allowed her to be further subjected to harm.

65.    I CAN's senior management personnel, Defendants herein, also frequently and repeatedly redressed Scott for her appearance, clothing, dress, all of which caused Scott severe physical and emotional distress, increased anxiety and duress, aggravating and intensifying Scott's medical and physical conditions and disabilities, for all of which damage and harm Scott demands judgment against Defendants for compensatory and punitive

damages, jointly and severally, with prejudice and in the amounts set forth at the end of this Complaint.

## COUNT EIGHT

66.     Due to defendant's wrongful employment practices, Plaintiff was harassed, denied wages, benefits and promotions, while other non-male, non African American employees with no more seniority or job experience and with no higher qualifications than Plaintiff, but who were not Plaintiffs gender or race did not similarly suffer from a hostile work environment nor were they denied their rights.

67.   Defendants acted in a willful and wanton manner in discriminating against Plaintiff and Defendants took no steps to correct these practices even though they were brought to the attention of officials at all levels of I CAN.

68.     These acts were because of Plaintiff's race and gender in violation of State and Federal law, as well as the common law.

69.     As a proximate result of Defendants' severe and intentional acts of discrimination, Plaintiff suffered severe emotional distress, psychological damage, and the deprivation of their statutory and constitutional rights.

## COUNT NINE

70.     Plaintiff was retaliated against because she filed charges of discrimination against Defendants in violation of State and Federal Law.

71.   And, Defendants' intentional, willful, and wanton threats and harassment of Plaintiff was discriminatory and violates Ohio Rev. Code Sections 4112.02(A) through 4112.99.

## COUNT TEN

72.     Defendants   created   a   hostile   work   environment   for   Plaintiff   that   adversely

impacted their employment relationship and denied their rights, privileges, or immunities secured by the Constitution and laws by using the rules, customs, usages of the Policies and Procedures to unfairly discipline, threaten, harass and disparage Plaintiff.

73.     And, Defendants denied Plaintiff, a citizen of the United States, their rights, privileges, or immunities under the color of regulations, customs, or usages and subjected her to the deprivation of their rights, privileges, or immunities secured by the Constitution and laws, including but not limited to their constitutional rights to substantive due process and equal protection. Defendants are liable to Plaintiff in an action at law, suit in equity, or other proper proceeding for redress in an unknown amount to be determined at trial.

74.     Defendant's intentional, willful, and wanton acts were discriminatory and also violate Ohio Rev. Code Sections 4112.02(A) through 4112.99.

75.     Defendants acted with malice and ill will toward Plaintiff without regard for their legal rights and otherwise discriminating against her because of their race and gender.

76.     As a direct and proximate result of Defendant's actions as set forth above, Plaintiff has suffered loss of compensation, loss of fringe benefits, loss of the opportunity to be able to continue the gainful employ in which he has been engaged for numerous prior years, loss of future earnings and loss of reputation, humiliation, embarrassment, loss of self esteem, adverse health effects and loss of time and money endeavoring to protect herself form Defendant's unlawful discrimination, including costs and reasonable attorneys fees in amounts to be proven in trial.

**COUNT ELEVEN**

77.     In an attempt to justify the discrimination, Defendants had several meetings in which Plaintiff's performance was examined with defamatory and libelous statements designed

15

to impugn Plaintiff's good name and reputation and this conduct was done wantonly and with malice.

78.     Defendants engaged in the herein described conduct willfully, maliciously, outrageously, deliberately, purposely, recklessly and with the intent to cause Plaintiff severe and extreme emotional distress.

79.     As a direct and proximate result of Defendants' conduct, Plaintiff incurred and continues to incur severe, extreme and grievous mental and emotional suffering, nervousness and anxiety, and such conduct violated common law.

## COUNT TWELVE

80.     As a direct and proximate result of Defendants' conduct, Plaintiff incurred and continues to incur severe, extreme and grievous mental and emotional suffering, nervousness and anxiety which was or should have been reasonably foreseeable by the Defendants, and such negligent conduct violated common law.

## COUNT THIRTEEN

81.     The treatment of Plaintiff by Defendants was in violation of express and implied contracts of employment, the breach of which constitute violations of common law.

82.     By reason of this breach of express and implied contracts Plaintiff has suffered injury and damage, both economic and personal and also pain and suffering entitling her to compensatory and punitive damages from the Defendants in amounts to be prove at trial.

## COUNT FOURTEEN

83.     Defendants induced Plaintiff to work for Defendants knowing that conditions of discrimination existed at the work place that created a hostile work environment.

84.     Defendants fraudulently induced Plaintiff to work for Defendants despite the fact that Defendants knew that the discriminatory conditions and hostile work environment that existed were in violation of statutory and common law.

### COUNT FIFTHTEEN

85.     Defendants failed to operate with good faith and did induce Plaintiff to continue contracting with Defendants to their detriment in violation of common law.

86.     Defendants fraudulently induced Plaintiff to work for Defendants despite the fact that Defendant knew of the conditions that existed within the defendant in violation of common law.

### COUNT SIXTEEN

87.     Defendants' actions in publicly making or publishing false statements about Plaintiff have impugned their good name and reputation.

88.     These false statements were made to support the Defendants' actions to unlawfully discriminate against Plaintiff.

89.     As a direct and proximate result of Defendants' actions and inactions, Plaintiff has suffered, and will continue to suffer, loss of wages and benefits, emotional distress and embarrassment, and loss of reputation in amounts to be proven in trial.

### COUNT SEVENTEEN

90.     Defendants' intentional actions in publicly making or publishing false statements about Plaintiff were intended to impugn their good name and reputation for the purpose of having their employer terminate their employment or uphold the discriminatory acts that had been perpetrated against her.

91.     The Plaintiff is not a public figure.

92.     Defendants, when they made the false statements, had no qualified privilege protecting these statements.

93.     Defendants made these false statements deliberately and maliciously or with reckless and wanton indifference to the truth that have damaged Plaintiff's professional reputation and her standing in the community.

94.     As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered, and will continue to suffer, loss of wages and benefits, emotional distress and embarrassment and loss of reputation in amounts to be proven in trial.

### COUNT EIGHTEEN

95.     During the time that Plaintiff has worked for Defendants the individual Defendants have met in private, secret sessions and discussed ways of harassing or terminating Plaintiff.   At these meetings, communications, phone calls, text messages and face-to-face encounters Defendants still employed with Defendants conspired in order to further harass and discriminate against Plaintiff and deny her civil rights.

96.     Consequently, the Defendants engaged in a conspiracy for the purpose of depriving, either directly or indirectly, Plaintiff of the equal protection of the laws, or of equal privileges or immunities of the laws; and performed acts in furtherance of the conspiracy; and, Plaintiff was injured in their person or property or deprived of rights or privileges of a citizen of the United States.

97.     And, if some of the Defendants did not specifically engage in the conspiracy against Plaintiff they nonetheless had knowledge of the conspiracy and they, while acting with reasonable diligence, had the power to prevent or aid in preventing the commission of acts under

the conspiracy but neglected or refused to so do.  Defendants engaged in this conduct because of Plaintiff's medical condition and handicap and gender.

98.    Plaintiff states that the Defendants are in the direct chain of supervision over her and that all or some of these defendants utilized discriminatory promotion evaluations and that they retaliated against her for objecting to her disparate treatment.

99.    Defendants possessed varying degrees of control over Plaintiff's working conditions are or were at all times herein relevant their direct supervisors who had the authority to hire, fire, promote, demote, suspend discipline and otherwise directly control their employment relationship with her.

100.    Plaintiff alleges that she was treated less favorably than their similarly situated employees.

101.    In retaliation for objecting to discriminatory performance evaluations, the Defendants retaliated against her by placing her in a hostile work environment and preventing her from being promoted.

102.    The Defendants acted as a result of Plaintiff's objections, the Defendants knew about Plaintiff's objections to the allegedly racially discriminatory performance evaluations, the Defendants knew that Hollinger had admitted being a racist.

103.    Plaintiff opposed the discriminatory evaluations and non-promotion and Defendants knew this and continued to discriminate against Plaintiff.

104.    Thus, Plaintiff has engaged in a protected activity and that the Defendants clearly knew of the activity.

105.    As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered, and will continue to suffer, loss of wages and benefits, emotional distress and

embarrassment and loss of reputation in amounts to be proven in trial.

**WHEREFORE**, NICHELLE C. SCOTT, Plaintiff, prays for a judgment against Defendants, in their individual and official capacities respectively, for compensatory and punitive damages, jointly and severally, with prejudice and in an amount in excess of TWENTY-FIVE THOUSAND and 00/100 DOLLARS ($25,000.00), on each count and claim of the Complaint herein, together with all costs of litigation, reasonable Attorneys' fees, all costs of this action, and for such other and further relief at law and equity as this Honorable Court shall find, make and ORDER, and for interest on all judgments and awards at the legal rate, from the date of wrongful discharge of Defendant and continuing until fully paid and satisfied. Any other equitable relief that the Court deems appropriate.

Respectfully Submitted,

/s/Robert C. Brooks II

_____
Robert C. Brooks II, Sup. Ct. Reg. #0040881
1893 East 82nd Street
Cleveland, Ohio 44103
(216) 401-3869
(855) 218-8199 Fax
RBrooksii2000@gmail.com

**ATTORNEY FOR PLAINTIFF**

### JURY DEMAND

Plaintiffs request a trial by jury pursuant to Federal Rules of Civil Procedure.

/s/Robert C. Brooks II

_____
Robert C. Brooks II
Attorney for Plaintiff